## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

**MICHAEL S. KASANOFF, ESQ.** (***pro hac vice* pending**)  **JONNA M. SPILBOR, ESQ.**
**MICHAEL S. KASANOFF, LLC**             **JONNA SPILBOR LAW**
9 Stillwell Street                        214 Main Street
Matawan, NJ 07747                         Poughkeepsie, NY 12601
(908) 902-5900                            (845) 485-2LAW
mkasanoff@att.net                         ladylaw@jonnaspilbor.com

*Attorneys for Plaintiff Sean S. Newman, as the Administrator of the Estates of Michael J. Newman (deceased) and Dolores D. Newman (deceased) individually and on behalf of others*

|  |  |  |
|---|---|---|
| SEAN S. NEWMAN, as the Administrator of the Estates of MICHAEL J. NEWMAN (deceased), and DOLORES D. NEWMAN (deceased), individually and on behalf of others, | : : : : : : | Civil Action No.: 1:23-cv-02391 |
|  | : | |
| Plaintiffs, | : : | |
| vs. | : : | **COMPLAINT AND JURY DEMAND** |
| ANDREW M. CUOMO, MELISSA DeROSA, HOWARD A. ZUCKER, M.D., GREATER NEW YORK HOSPITAL ASSOCIATION, KENNETH RASKE, NORTHWELL HEALTH, INC., MICHAEL DOWLING, and JOHN DOES A-Z, | : : : : : : : : | |
|  | : | |
| Defendants. | : : | |

**"For nursing homes, this could be like fire through dry grass."**

**Governor Andrew Cuomo - March 15, 2020**

**"Coronavirus and a nursing home is a toxic mix. We have said from day one, coronavirus in a nursing home can be like fire through dry grass."**

**Governor Andrew Cuomo - March 29, 2020**

**"We've said, 157 times, the most vulnerable population are seniors. The most vulnerable place are nursing homes. We have special precautions for nursing homes. I think we've been talking about it all along."**

**Governor Andrew Cuomo - April 17, 2020**

**"The nursing home is the optimum feeding ground for this virus. Vulnerable people in a congregate facility, in a congregate setting where it can just spread like fire through dry grass. We have had really disturbing situations in nursing homes, and we're still most concerned about the nursing homes."**

**Governor Andrew Cuomo - April 19, 2020**

**If somebody says to me, 'Should I put my mother in a nursing home now?' Now is not the best time to put your mother in a nursing home. That is a fact."**

**Governor Andrew Cuomo - April 22, 2020**

**"This is a crisis situation for nursing homes. They are under a lot of pressure. We understand that. Through no fault of their own, by the way.  This happens to be a virus that happens to attack elderly people and nursing homes are the place of elderly people, so this is a very intense situation for nursing homes, we get it, but they still have to perform their job and do their job by the rules and regulations."**

**Governor Andrew Cuomo - April 23, 2020**

**"An aerosol disease in a facility filled with individuals particularly vulnerable to the disease is simply a recipe for disaster."**

**NYSBA Task Force on COVID-19 in New York Nursing Homes and Long-Term Care**

**According to data released by the New York Department of Health, "The admission of coronavirus-positive patients into New York nursing homes under March 25 guidance from the New York State Department of Health was associated with a statistically significant increase in resident deaths.**

**"COVID-positive Admissions Were Correlated with Higher Death Rates in New York Nursing Homes" - by Bill Hammond and Ian Kingsbury of the Empire Center - February 18, 2021**

Plaintiff, the Estate of Michael J. Newman, and the Estate of Dolores D. Newman, by and through their Administrator Prosequendum, Sean S. Newman (collectively the "Estate" or "Plaintiff"), individually and on behalf of others similarly situated ("the Statewide Class"), through their attorneys, by way of Complaint against Defendants Andrew M. Cuomo, the Governor of the State of New York, in his individual capacity; Melissa DeRosa, Secretary to the Governor of the State of New York, in her individual capacity; Howard A. Zucker, Commissioner of the New York Department of Health, in his individual capacity (Governor Cuomo, Secretary DeRosa, and Commissioner Zucker collectively referred to as "the New York Defendants"); Greater New York Hospital Association; Kenneth Raske (Greater New York Hospital Association and Kenneth Raske collectively referred to as "GNYHA"); Northwell Health, Inc.; Michael Dowling (Northwell Health, Inc. and Michael Dowling  collectively referred to as "Northwell"); and John Does A-Z (all collectively referred to at times as "Defendants") says:

## **INTRODUCTION**

This action seeks concrete answers to, and appropriate resolution of, several unsettling questions:

1) Why was discharging COVID positive hospital patients into nursing homes the only strategy of the Cuomo administration for 6 weeks, while knowing full well that nursing homes were ill-equipped to deal with these patients? Shouldn't this have been the absolute last strategy, especially when provisional hospitals such as the Javits Center and USS Comfort were available?

2) Why was the March 25, 2020 Order applicable to nursing homes, and the identical April 7, 2020 Order applicable to assisted living facilities (collectively "the Directives"), which defied science and common sense, released by the Executive Chamber Staff without guidance from the Department of Health's professional experts? Furthermore, why were the Directives defended for 6 weeks, and then covered up and lied about for 10 months?

3)   What was the full extent of the participation of the healthcare lobbyists as represented by GNYHA, in the formation and implementation of the Directives and the April 10, 2020 blanket immunity for the health industry? How did they benefit from this, and why was the Executive Chamber eager to follow the direction of the GNYHA despite the imminent public harm?

4)   Why did Governor Cuomo repeatedly blame nursing home staff for bringing COVID into nursing homes, but conveniently never shared the March 6th, 2020 directive suggesting that employees with the flu vaccine were exempted from wearing masks?

5)   Why did the Assembly report omit how the Cuomo Administration used State resources illegally when they provided VIP at-home COVID testing to political allies, friends and families during the height of the pandemic in 2020, when no one else, especially our most vulnerable in the nursing homes, had access to these scarce tests?

6)   Why did the New York Joint Commission on Public Entities ("JCOPE") shift its role from being a watchdog agency on ethics to a puppet service granting the Executive Chamber's every wish while deliberately ignoring several ethical quandaries in favor of the Executive Chamber's Narrative?

On March 25, 2020, the New York Defendants, at the behest of and with the direct assistance of GNYHA and Northwell, administratively issued the following directive ordering all nursing homes in the State, "No resident shall be denied re-admission to a [nursing home] solely based on a confirmed or suspected diagnosis of COVID-19. [Nursing homes] are prohibited from requiring a hospitalized resident who is determined medically stable to be tested for COVID-19 prior to admission or readmission." On April 7, 2020, the New York Defendants, again at the behest of and with the direct assistance of GNYHA and Northwell, issued an identical directive applicable to assisted living facilities.

The New York Defendants were warned that the Directives would be a deadly disaster for elderly nursing home residents, the most vulnerable Covid demographic, while GNYHA and Northwell, purported experts in the field, knew or should have known that the Directives would be a deadly disaster for elderly nursing home residents, but exhibited deliberate indifference by

4

aggressively pushing for the Directives anyway.

The New York Defendants knew the Directives would be a deadly disaster, as exemplified by Governor Cuomo's acknowledgment, "For nursing homes, this could be like fire through grass." The New York Defendants knew all of this, yet at the behest of and with the direct assistance of GNYHA and Northwell, they maliciously and in an act of coordinated and deliberate indifference, promoted, promulgated and enforced the Directives anyway.

As a result of the Directives, over 9000 (nine-thousand) Covid positive patients who otherwise would not have been admitted to the State's nursing homes and assisted living facilities, were admitted, resulting in as many as 15,000 (fifteen-thousand) wholly avoidable Covid deaths. The Directives amounted to mass State-sanctioned euthanasia of its elderly victims. Nothing can literally replace these senseless wholly avoidable losses of life, but Plaintiff, individually and on behalf of all those similarly situated, now seeks appropriate healing and resolution, as these lives meant something, and they did not deserve to die such a preventable death.

## JURISDICTION AND VENUE

The Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), 28 U.S.C. § 1343(a)(4), and 42 U.S.C. § 1983. The amount in controversy exceeds $75,000, exclusive of interest and costs. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2).

5

## PARTIES

### Plaintiff

1.      Plaintiff, the Estate of Michael J. Newman by and through his Administrator Prosequendum, Sean S. Newman, is the Estate of the decedent, Michael J. Newman ("Michael"). The decedent, was a resident of the Grandell Rehabilitation and Nursing Center, 645 West Broadway, Long Beach, NY 11561 ("GRNC").

2.      Michael began experiencing Covid-19 ("Covid") symptoms with a fever and his lungs filling up on March 29, 2020, and then died of Covid three hours later that same day at the age of 84. Michael was posthumously diagnosed with Covid on his Death Certificate.

3.      Sean S. Newman ("Sean") is a son of Michael J. Newman, and the named Administrator of the Estate. The Estate is located in Nassau County, New York. Michael J. Newman was the husband of Dolores D. Newman for 59 years.

4.      Plaintiff, the Estate of Dolores D. Newman by and through her Administrator Prosequendum, Sean S. Newman, is the Estate of the decedent, Dolores D. Newman ("Dolores"). The decedent, was a resident of the Long Island Living Center, 431 Beach 20th Street, Queens, NY 11691 ("LILC").

5.      Dolores began experiencing Covid-19 ("Covid") symptoms with cough, headache, and difficulty breathing on April 10, 2020. She was transported to the hospital on April 11, 2020, where she was diagnosed with Covid when she arrived. She died of Covid at the hospital on April 14, 2020 at the age of 78.

6

6.      Sean S. Newman ("Sean") is a son of Dolores D. Newman, and the named Administrator of the Estate. The Estate is located in Nassau County, New York. Dolores D. Newman was the wife of Michael J. Newman for 59 years.

### The Statewide Class

7.      The Statewide Class that Plaintiff seeks to represent is defined as follows:

> All individuals who were New York nursing home residents and/or assisted living facility residents where a Covid positive patient was admitted after the March 25, 2020/April 7, 2020 Orders, and who subsequently contracted Covid, and then died of Covid (the "Statewide Class").

### Defendants

8.      Defendant Andrew Cuomo, who is being sued in his individual capacity, was the 56th Governor of New York, who served in office from 2011 to 2021, before resigning in disgrace on the verge of impeachment amidst numerous allegations of sexual misconduct. His address at all relevant times was the New York State Capitol Building, Albany, NY 12224.

9.      Defendant Melissa DeRosa, who is being sued in her individual capacity, was the Secretary (Chief of Staff) to the Governor of New York from 2017 until 2021. Her address at all relevant times was the New York State Capitol Building, Albany, NY 12224.

10.      Defendant Howard A. Zucker, M.D., who is being sued in his individual capacity, was the 16th Commissioner of the New York Department of Health from 2015 to 2021. During the Covid pandemic, "he appeared frequently in the media as the ultimate expert on the status of the pandemic in the State of New York." His address at all relevant times was the Corning Tower, Empire State Plaza, Albany, NY 12237.

11.     Defendant Greater New York Hospital Association ("GNYHA") is an IRS 501(c)(3) organization representing and engaging in public advocacy on behalf of approximately 160 hospitals and health systems doing business in the State of New York and adjacent States. Its addresses at all relevant times were 555 West 57th Street, 15th Floor, New York, NY 10019 and 234 Hudson Ave., Albany, NY 12210.

12.     Defendant Kenneth Raske is the President and Chief Executive Officer of the GNYHA. His address at all relevant times is 555 West 57th Street, 15th Floor, New York, NY 10019.

13.     Defendant Northwell Health, Inc. ("Northwell") is a nonprofit integrated healthcare network that is New York State's largest healthcare provider and private employer, with more than 81,000 employees.  Its address at all relevant times was 2000 Marcus Avenue, New Hyde Park, NY 11042-1169.

14.     Of the more than 9000 (nine-thousand) Covid positive patients who otherwise would not have been admitted to the State's nursing homes and assisted living facilities due to the Directives, over 1700 (one-thousand seven-hundred) were transferred from Northwell.

15.     Defendant Michael Dowling is the President and Chief Executive Officer of Northwell. His address at all relevant times is 2000 Marcus Avenue, New Hyde Park, NY  11042-1169. Mr. Dowling previously served in New York State government as state director of Health, Education and Human Services and deputy secretary to former governor Mario Cuomo. Mr. Dowling is also the past chair and current board member of GNYHA.

16.     John Does A-Z are other individuals and/or entities, whose identities and involvement can only be ascertained through further discovery.

## BACKGROUND APPLICABLE TO MICHAEL NEWMAN, DECEASED

17.     Michael was born on January 21, 1936.

18.     Michael served in the Air Force, and then was a New York City firefighter for 23 years.

19.     Prior to his almost immediate death due to Covid, Michael was in declining health and had a catheter which needed attending to, and also had declining dementia, conditions which required his admission into a nursing home.

20.     On February 7, 2020, Michael was admitted to Grandell Rehabilitation and Nursing Center, 645 West Broadway, Long Beach, NY 11561 ("GRNC").

21.     At time of his admission, Michael had not incurred COVID-19 and had no symptoms thereof.

22.     Michael began experiencing Covid symptoms with a fever and his lungs filling up on March 29, 2020, and then died of Covid three hours later that same day at the age of 84. Michael was posthumously diagnosed with Covid on his Death Certificate.

## BACKGROUND APPLICABLE TO DOLORES NEWMAN, DECEASED

23.     Dolores was born on December 12, 1941.

24.     Dolores was a homemaker and mother of three children, who had a part-time job working for neighborhood dentist before retiring after 20 years.

25.     Prior to her death due to Covid, Dolores was in declining health which required her admission into an assisted living facility.

26.     On December 26, 2019, Dolores was admitted to the Long Island Living Center, 431 Beach 20th Street, Queens, NY 11691 ("LILC").

27.     At time of her admission, Dolores had not incurred COVID-19 and had no symptoms thereof.

28.     Dolores began experiencing Covid-19 ("Covid") symptoms with cough, headache, and difficulty breathing on April 10, 2020. She was transported to the hospital on April 11, 2020, where she was diagnosed with Covid when she arrived.

29.     At the hospital, Dolores needed more oxygen, her throat was hurting, and she had a cough and fever. The doctors at the hospital called Sean on April 13, 2020, and told him that Dolores was in and out of consciousness, and was given more oxygen. The next day, on April 14, 2020, she died of Covid at the hospital at the age of 78.

## BACKGROUND APPLICABLE TO PLAINTIFF AND THE STATEWIDE CLASS

### Defendants Violated Plaintiff's and the Statewide Class's
### Constitutional Right To Life and Bodily Integrity

30.     In his memoir, Governor Cuomo wrote that he received guidance from researchers at the World Health Organization, Drexel University, the State University at Albany, Imperial College in England and Dr. Michael Osterholm of the University of Minnesota.

31.     However, his schedules for the first three months of the pandemic make no reference to Drexel, University of Albany, Imperial College, or Osterholm. They show one phone call with Bruce Aylward of the World Health Organization (WHO) on April 27 after New York's first wave had peaked.

32.     One health-related group who Governor Cuomo consulted regularly in the early months of the pandemic was hospital officials. The words "hospital," "medical center" and "health system" appear 288 times in his schedules for March and April – reflecting a series of large-group conference calls and smaller meetings.

33.     Several meetings involved leaders of the GNYHA, which is one of Albany's largest and most powerful lobbying forces and a major donor and political ally of the Governor Cuomo.  By way of contrast, nursing homes, have said that they were not consulted about the March 25, 2020 Directive before it was issued.

34.     Defendant Kenneth Raske, the president of the GNYHA, participated in seven meetings with Governor Cuomo between March 2 and March 30. Northwell Health chief, Defendant Michael Dowling, a GNYHA board member and longtime Cuomo associate, was listed at six meetings in March and three in April.

35.     At the urging of GNYHA and Northwell citing the "urgent need to expand hospital capacity," Governor Cuomo, on the advice, cooperation, and endorsement of the other New York Defendants, Secretary DeRosa and Commissioner Zucker, issued Directives to the State's nursing homes on March 25, 2020, and to the State's assisted living facilities on April 7, 2020 (the "Directives") ordering that no person could be "denied re-admission or admission to the [nursing home/assisted living facility] solely based on a confirmed or suspected diagnosis of COVID-19" and that "[nursing homes/assisted living facilities] are prohibited from requiring a hospitalized resident who is determined medically stable to be tested for COVID-19 prior to admission or readmission."

36.     The Directives were the product of corruption and undue influence from inception, as the New York Defendants were overly reliant on New York's powerful and influential hospital lobby operating by and through the GNYHA and Northwell. The Directives were inordinately "hospital-centric" because the "experts" called upon to shape the policy were primarily in the hospital sector, who were seeking to slither out of Governor Cuomo's previous order directing hospitals to immediately increase their bed capacity by at least 50%.

37.     Numerous newspaper articles published at that time attribute the actual origination of the Cuomo Directive to the GNYHA, e.g., the Feb. 26, 2021 edition of *STAT News*, an authoritative journal about health, medicine, and the life sciences, reported that "New York's influential hospital lobby was pleading with Cuomo to issue policy on transfers to nursing homes." In this article, GNYHA spokesperson Brian Conway, said "hospitals made the request because Cuomo had ordered hospitals to immediately increase bed capacity by at least 50%."

38.     The *Wall Street Journal* likewise reported that Defendant Kenneth Raske "president of the Greater New York Hospital Association, said he contacted Mr. Cuomo's team for help with nursing homes. Hospitals couldn't afford to house recovered nursing-home residents long-term, with models showing they soon could be swamped." And further that "Within days, Mr. Cuomo's team approved an order from the state's health department that said nursing homes couldn't refuse to admit patients simply because they had tested positive. The order would become one of the most controversial decisions of the response."

39.     Governor Cuomo expressed an open distrust towards scientific experts, while instead preferring to work with the healthcare industry. By doing so, Defendants exhibited an utter lack of regard for the lives of New York's elderly, supremely vulnerable nursing home patients.

12

40.     Indeed, the hospital lobby literally owned Governor Cuomo. As reported in the New York Times on October 3, 2019, the hospital lobby, *at the request of the Cuomo campaign* made a $1 million donation to the State Democratic Party (which Governor Cuomo controlled), a donation twice as large as any donation that the hospital lobby had given to any campaign in at least a decade. Soon after, Governor Cuomo quietly authorized an across the board increase in Medicaid reimbursement rates for the first time since 2008, at a cost to New York's taxpayers of $140 million, at a time when Medicaid spending was drastically over budget.

41.     Defendants GNYHA and Northwell did not just lobby for the Directives, they actually wrote the Directives in conjunction with the New York Defendants.

42.     Defendants proceeded despite *knowing* that there was early compelling evidence that nursing home/assisted living facility residents, particularly the elderly, were especially vulnerable to Covid and death by Covid.

43.     Just a day after the New York Defendants issued the March 25, 2020 Directive, three organizations,  to wit, the Society for Post-Acute and Long-Term Care Medicine ("AMDA"), the National Center for Assisted Living ("NACL"), and American College of Health Care Administrators ("CHCA"), all describing themselves as dedicated to preserving the safety of patients, residents, and other long-term care facilities, issued a dire warning about the March 25, 2020 Directive.

44.     They urged other states not to enforce the kind of policy being implemented in New York. They presented COVID data from the Washington State nursing home which was ravaged by Covid, and explained why a one-size fits all approach statewide could be dangerous.

13

45.     Their joint statement continued, "We strongly object to this policy Directive and approach to developing surge capacity. We are aware that other states may already be adopting a similar approach in order to free up hospital beds. This is a short-term and short-sighted solution that will only add to the surge in COVID-19 patients that require hospital care. Based upon what we **currently know** about how this virus can spread in institutional settings, the hospitalizations and case fatality rate, this action by a state will put the many frail and older adults who reside in nursing homes at risk."

46.     These independent experts went on to advocate the creation of separate settings for recovering Covid patients, including large field hospitals, dormitories, hotels, and shuttered nursing homes or hospitals. In other words, keep the virus out of facilities by isolating Covid positive patients from the extremely vulnerable elderly.

47.     On March 27, 2020, the Javits Convention Center becaame a provisional hospital, offering **2,500 (twenty-five hundred) beds**.

48.     On March 28, 2020, Governor Cuomo announced that the federal government approved four additional hospital sites, which would have added **4,000 (four-thousand) beds**: (1) Brooklyn Cruise Terminal; (2) Aqueduct Racetrack facility in Queens; (3) CUNY Staten Island; (4) New York Expo Center in the Bronx.

49.     On March 30, 2020, the USNS Comfort arrived in New York City as a provisionary medical facility, offering **1,000 (one-thousand) beds**.

50.     Vice Admiral Mike Dumont begged the Cuomo administration to send patients to the nearly-empty hospital ship docked on the Hudson River during the height of the pandemic — but his pleas were met with politics and paranoia.

14

51.     On April 7, 2020, Admiral Dumont wrote to Defendant DeRosa, "We could use some help from your office .... The Governor asked us to permit use of USNS COMFORT to treat patients without regard to their COVID status and we have done so. Right now we only have 37 patients aboard the ship. Further, we are treating only 83 patients at the Javits Events Center." (The Javits Center had space for 2,500 beds).

52.     Admiral Dumont continued, "We have been trying for days to get the Health Evacuation Coordination Center (HECC) to transfer more patients to us but with little success. We are told by NYC officials the HECC falls under the State's Department of Health .... Our greatest concern is two-fold: helping take the strain off local hospitals, and not wasting high-end capabilities the US military has brought to NYC. We appreciate the help."

53.     Within minutes, Defendant DeRosa circulated the admiral's message to the state's top COVID officials, including Michael Kopy the director of New York's emergency management office, Defendant Zucker, and Defendant Dowling, the private CEO of Northwell Health, the state's largest health care provider, and one of the authors of the Directives.

54.     Defendant DeRosa, sniffing a plot, pivoted to politics, telling Director Kopy, Defendant Zucker, and Defendant Dowling to be on guard and accused Admiral Dumont of trying set up Team Cuomo to blame for the empty facilities, "They are setting this up to say that we are the reason the ship and javitts [sic] are empty –I'm going to loop you guys on the email. we need to make clear in writing that what he has written here is not true," she told Director Kopy, Defendant Zucker, and Defendant Dowling.

15

55.     Admiral Dumont, who retired in 2021, was disheartened by Defendantt DeRosa's reaction, which was subsequently relayed to him: "It is discouraging to learn they completely misread and misunderstood the request for assistance ....We had neither the time nor the interest in setting anyone up for blame .... My request was solely to highlight the low numbers of patients being treated and ask for their help in better utilizing the military medical resources available. There was nothing in the request that was not truthful, and we never claimed anyone was preventing the transfer of patients to treatment sites provided by the US military. How they reached these conclusions is both perplexing and discouraging."

56.     Most damningly for Defendants, Governor Cuomo openly admitted in his book, that "we were never in a dire situation. **The state always had additional beds available all across the state.** Therefore the critics premise that we 'forced' nursing homes to take COVID-positive people is patently false and illogical because we always had alternative available beds throughout the state. **We never 'needed' nursing home beds.**"

57.     Yet despite the fact that New York "always had additional beds available all across the state" and "never needed nursing home beds", it is a documented fact that over 9,000 (nine-thousand) Covid-positive patients were flooded into New York's nursing homes/assisted living facilities between the time the Directives were respectively promulgated on March 25, 2020 and April 7, 2020, and the time they were belatedly repealed on May 10, 2020, including over 1,700 (one-thousand seven-hundred) from Defendant Northwell alone.

58.     It is further documented fact that over 15,000 (fifteen-thousand) nursing home/assisted living facility residents died of Covid after the promulgation of the Directives, and it has also been established (after an extended period of participation in the initial cover-up) by none other than the New York Department of Health, that the "admission of coronavirus-positive patients into New York nursing homes under March 25 guidance from the New York State Department of Health was associated with a statistically significant increase in resident deaths."

59.     Despite the existence of more than enough beds to completely avoid the scientifically invalid Directives along with its deadly consequences, those beds went unused! On April 7, 2020, the New York Defendants inexplicably and inexcusably significantly tightened the admission criteria for the Javits Center and the USNS Comfort which effectively barred 95% of patients being transferred there, as both facilities remained empty for most of the pandemic.

60.     Why did this transpire? In Governor Cuomo's book, he states that he never asked for the USNS Comfort and mocked its deployment as "the ultimate photo opportunity." It is crystal clear that vulnerable elderly people died as a result of Governor Cuomo's political pride.

61.     It was not only Governor Cuomo's pride that was leading to thousands of needless deaths, but his unmitigated greed as well. JCOPE issued a report concluding that the arrangement that Governor Cuomo had with his $5 million book deal, "created financial incentives–or, at a minimum, the appearance of such incentives–for the Governor **to tailor his policies and actions to generate material for his book and/or secure a lucrative publishing contract**."

62.     But the bottom line is this: It is indisputable that New York had more than enough beds to accommodate Covid-positive patients rather than forcing them into nursing homes to the detriment of New York's most vulnerable elderly. **NONE OF THIS HAD TO HAPPEN**.

63.     Thus Defendants cannot credibly claim that there was no alternative to the Directives, as they knew that there were multiple viable alternatives, but ignored them to the detriment of Michael Newman, Dolores Newman, and 15,000 other elderly and infirm nursing home patients who died horrible Covid deaths, most while scared and alone.

64.     Defendants cannot credibly defend this case on grounds that there was "an apparent absence of harmless options", or that they attempted "to choose the least of evils". By their own admission, there was a clear unequivocal path around the Directives.

65.     By purposely choosing not to go down that readily available path, which resulted in the wholly avoidable deaths of 15,000 elderly nursing home residents, Defendants not only exhibited "deliberate indifference", but malicious intent and/or an extreme degree of recklessness to the point where Defendants focused upon the risk of unconstitutional conduct and deliberately assumed or acquiesced in such risk in a manner that as a matter of law, shocks the conscience thereby stating a substantive due process claim and/or otherwise caused a State created danger to Plaintiff and the Statewide Class.

66.     Private sector Defendants GNYHA and Northwell are jointly and severally liable as state actors in conjunction with the New York Defendants in accordance with the principles of law set forth in *Savarese v. City of New York*, 547 F. Supp. 3d 305, 340 (S.D.N.Y. 2021)(citations omitted):

a.     A defendant acts under color of state law where he is a willful participant in joint activity with the State or its agents;

b.     The touchstone of joint action with the state is often a plan, prearrangement, conspiracy, custom, or policy shared by the private actor and the government; and

c.    Private conduct may also constitute state action where the state exercises coercive power over, is entwined in the management or control of, or provides significant encouragement, either overt or covert to, a private actor, or where the private actor operates as a willful participant in joint activity with the State or its agents, is controlled by an agency of the State has been delegated a 'public function' by the state, or is entwined with governmental policies.

67.    Defendants *knew* from the outset that the Directives were completely unworkable as they *knew* that most nursing homes and assisted living facilities are small, older buildings without upgraded ventilation.

68.    Defendants *knew* that there were no nursing homes or assisted living facilities in New York State that were equipped to handle an airborne, highly contagious and deadly virus.

69.    Defendants *knew* that the Directives did not conform with the State Administrative Procedure Act and were without any factual, medical or other scientific evidence.

70.    Defendants *knew* that the lack of compliance with infection protocols put residents at increased risk.

71.    Defendants *knew* that insufficient PPE (personal protective equipment) for nursing staff put residents at increased risk of harm.

72.    Defendants *knew* that insufficient Covid testing for residents and staff put residents at increased risk of harm.

73.    Defendants *knew* that staffing was too lean to accept any stress to the system.

74.    Defendants *knew* that nursing homes and assisted living facilities throughout New York had not done the necessary additional hiring in anticipation of Covid's arrival.

75.    Defendants *knew* that nursing homes and assisted living facilities throughout New York had not  undertaken the necessary levels of staff training.

19

76.     Defendants also *knew* that the nursing homes and assisted living facilities, which in many instances depended upon nearby hospitals for referrals and were eager for new revenue that came with hospital patients, would gladly accept these patients, yet Defendants did nothing substantive to prevent the deadly combination of inadequate facilities with an overflow of Covid patients. In fact, through the Directives, this deadly combination was encouraged by Defendants.

77.     The New York Attorney General's (NYAG) subsequent investigation concluded that facility decisions relating to or affecting resident care are financially motivated rather than clinically motivated, an eminently foreseeable real-world outcome that was willfully disregarded by the New York Defendants

78.     The NYAG's finding should not come as a surprise as Defendants *knew* that the current state reimbursement model for nursing homes gives a financial incentive to owners of for-profit nursing homes to transfer funds to related parties (ultimately increasing their own profit) instead of investing in higher levels of staffing and PPE.

79.     Indeed, on March 18, 2020, the CDC in a study of the nation's first large outbreak in the Kirkland, Washington nursing home, told health officials, "Substantial morbidity and mortality might be averted if all long-term care facilities take steps now to prevent exposure of their residents to COVID-19." Instead, Defendants through the Directives, did the exact opposite.

80.     Defendants were forewarned by Washington State, and were forewarned by Italy where it was learned that the disease was ravaging the elderly population with an average age of death being 81 years old. Instead of consulting the Legislature, Governor Cuomo assumed near dictatorial powers. Instead of protecting the already vulnerable elderly, Defendants further endangered them through the Directives.

81.     It has been said that the single greatest error of America's response to the pandemic in nursing homes, was the failure to provide early and vast access to virus testing for residents and staff. Without testing, nursing home staff focused on isolating residents who showed symptoms of the virus, while asymptomatic residents and staff continued to spread the virus throughout the facilities. This is exactly what the plain language of the Directives accomplished. Without widespread testing, efforts to stop the spread were doomed.

82.     Governor Cuomo has repeatedly and preposterously defended the Directives as being based upon, and in conformity with, CDC Guidelines. That is not the position taken by the Federal Government.

83.     Former Secretary of HHS Alex Azar said, "There is no CDC guidelines saying you should  be taking COVID patients and putting them back in the community nursing homes."

84.     Former CMS Administrator Seema Verma said, "Under no circumstances should a hospital discharge a patient to a nursing home that is not prepared to take of those patient's needs."

85.     White House COVID-19 Coordinator Dr. Deborah Birx said that New York's Directives violated CMS regulations.

86.     Governor Cuomo's next outlandish defense of the Directives is that despite its plain authoritative language, nursing homes were not mandated to accept Covid-positive patients. The best known fact-checking watchdog, Politifact, rated Governor Cuomo's claim "Mostly False".

87.     Due to the absoluteness of Defendants' Directives, nursing home and assisted living facility operators felt pressured to the point where they had no choice but to accept residents who were either known to be infected or suspected to be Covid-positive. That's because the Directives did not say anything about making sure that a nursing home or assisted living facility can care for

a patient before making an admission decision, and said they "must comply with the expedited receipt of residents." This is confirmed by Governor Cuomo's own statement where he said that nursing homes "don't have the right to object" to the state's policy. In the month following the Directives, nursing homes and assisted living facilities pleaded for relief from the order.

88.     Despite all of these warnings, and all of the insurmountable real world logistical obstacles, Defendants dogmatically in a tone-deaf fashion, exercised deliberate indifference by implementing the Directives anyway.

89.     Defendants *knew* all of the foregoing and have no viable defense or rebuttal to the evisceration of the Directives, yet they implemented and enforced the Directives anyway.

90.     By deliberately implementing, encouraging and enforcing the Directives, which resulted in the wholly avoidable deaths of 15,000 elderly nursing home/assisted living facility residents, Defendants not only exhibited "deliberate indifference", but malicious intent and/or an extreme degree of recklessness to the point where Defendants focused upon the risk of unconstitutional conduct and deliberately assumed or acquiesced in such risk in a manner that as a matter of law, shocks the conscience thereby stating a substantive due process violation and/or otherwise caused a State created danger to Plaintiff and the Statewide Class.

91.     The Directives proved to be so draconian, that nursing homes and assisted living facilities tried to persuade the office of the Governor and other State officials as to the medical unsoundness forcing them to take patients without COVID testing.

92.     Individuals and families with parents, in-laws or other relatives in the State's nursing homes and assisted living facilities immediately initiated efforts to have the Directives reconsidered and repealed.

93.     Defendants ignored the written and oral pleas of these family members to repeal the Directives.

94.     When Defendants persisted with the implementation of the Directives, New York State nursing homes and assisted living facilities had to comply with the admission of new patients without pre-testing them for infection with COVID-19.

95.     During this period, there was, by definition, no differentiation between and among nursing home/assisted living facility occupants on the basis of whether or not they may have been infected with COVID-19

96.     This policy of mandatory admission, non-testing and co-mingling of nursing home/assisted living facility residents constituted reckless endangerment by all of the Defendants.

97.     The deaths of numerous elderly New Yorkers were never counted as a deaths by COVID under the fraudulent COVID-19 mortality data collection procedures established and operated through the willful conduct of the New York Defendants.

98.     Various individuals began organizing an opposition campaign to both the Directives and the New York Defendants' fraudulent data collection and reporting system.

99.     Governor Cuomo publicly ridiculed such individuals, characterizing their views as "conspiracy theories" and "politically motivated."

100.    Also at the time, the New York State Legislature began consideration of legislation (A10840 and S8835) to grant any health care facility and health care staff immunity from civil or criminal liability for any harm or damages alleged to have been sustained providing health care services to COVID-19 patients.

101.    On July 6, 2020, The New York Department of Health issued a report (revised on February 11, 2021) continuing to understate the situation and that only approximately 6,326 COVID-positive residents were admitted to nursing home facilities between March 25, 2020 and May 8, 2020 and that there had been 6,432 COVID-19 resident deaths in New York state nursing homes through late June.

102.    Nevertheless and contrary to the views of independent medical authorities and the DOH report, the New York Defendants continued to deny the obvious causal connection between these two occurrences, namely the Directives and the death count.

103.    Now beginning to perceive their complicity and potential liability, Defendant GNYHA began to petition the New York State Legislature for legislation (A10840 and S8835) to grant any health care facility and health care staff immunity from civil or criminal liability for any harm or damages alleged to have been sustained providing health care services to COVID-19 patients.

104.    In a memorandum dated April 2, 2020 to the CEOs of the GNYHA membership, Defendant Raske informed them that he was "very pleased to report that the Emergency Disaster Treatment Protection Act is included in the State fiscal year 2021 final budget."

105.    Astoundingly but no doubt honestly, this memorandum flatly admitted and that the GNYHA had "drafted and aggressively advocated for this legislation." That memorandum, as best as can be determined, has now been withdrawn from the GNYHA website.

106.    On August 3, 2020, Governor Cuomo signed the immunity legislation in law (§§ 3080 – 3082 of Article 30-d of the Public Health Law Relating to the Emergency or Disaster Treatment Protection Act).

24

107.     Numerous press reports at the time of  the issuance of the Directives and the enactment of related immunity legislation reveal extensive political contributions flowing from Defendant GNYHA and related industry groups and individuals to Defendant Cuomo and state legislators, e.g., "Health Care Groups, Lobbyists Padded Cuomo Campaign Coffers amid COVID Crisis, Immunity Push" New York Daily News (Feb. 24, 2020).

108.     On September 18, 2020, the Empire Center for Public Policy, Inc. (Empire Center) filed a lawsuit in the State Supreme Court in the County of Albany against the New York State Department of Health (DOH) after the DOH, headed by Defendant Zucker, refused to release records showing the full count of coronavirus deaths among nursing home residents.

109.     During this period, the New York Defendants continued to insist that all COVID-19 nursing home deaths were being fully, publicly, and accurately reported.

110.     On January 28, 2021, New York State Attorney General Letitia James issued a report concluding that there had been a significant undercount by as much as ***fifty-percent (50%)*** of the number of COVID-19 deaths in New York nursing homes.

111.     The January 2021 Attorney General report found that Article 30-D may have provided nursing homes with "financial incentives to put residents at risk of harm by refraining from investing public funds to obtain sufficient staffing to meet residents' care needs, to purchase sufficient PPE for staff, and to provide effective training to staff to comply with infection control protocols during pandemics and other public health emergencies."

112.     On February 3, 2021, New York State Supreme Court Justice Kimberly A. O'Connor ruled in favor of the Empire Center directing the DOH to disclose the requested information and ordering the state to pay for the Empire Center's legal fees.

113. On February 11, 2021, Governor Cuomo's Secretary (Chief of Staff), Defendant Melissa DeRosa disclosed at a private meeting with Members of the New York legislature that the State had deliberately hidden the true number of COVID-19 deaths in New York State nursing homes.

114. On April 6, 2021, Governor Cuomo signed into law a bill that would repeal the COVID-19 related legal immunity granted to health care facilities and health care professionals previously described in Paragraph 103.

115. On April 28, 2021, the New York Times reported, as patient advocates had maintained all along, that the State of New York had engaged in "a sustained effort" to hide the true nursing home death toll from the public and further that this cover up "was something Mr. Cuomo's aides had known since the previous spring."

116. On March 15, 2022, the NYS Comptroller Auditors found, in their audit and report, that the NYS DOH officials, under direction of Defendant Cuomo, purposefully undercounted the death toll by at least 4,100 residents and at times by more than fifty percent, allowing Governor Cuomo to repeatedly and falsely claim that New York was doing a better job than other states in protecting highly vulnerable seniors, the report says. This happened as Governor Cuomo was enriching himself by writing a memoir and negotiating a $5.1 million book deal.

117. Among the Report's findings:

"While the Department's duty is to act solely to promote public health, we determined that, rather than providing accurate and reliable information during a public health emergency, the Department instead conformed its presentation to the Executive's narrative, often presenting data in a manner that misled the public."

"DOH imposed impediments on the audit, including delaying requested data, limiting auditors' contact with program staff, not addressing auditors' questions during meetings, and not providing supporting documentation. These are not routine actions by state agencies undergoing an Office of the State Comptroller audit and raise serious concerns about the control environment at DOH."

118.    On March 17, 2022, the NYS Comptroller, Tom DiNapoli, penned an Op-Ed to summarize the March 15, 2022 audit findings. It states "DOH staff was working tirelessly, but from April 12, 2020, to Feb. 3, 2021, the agency used alternating ways of reporting nursing home deaths with little public explanation. Over those 10 months, it failed to report at least 4,100 lives lost to COVID-19. When it finally got a handle on tracking COVID nursing home deaths, and knew the correct numbers, the numbers continued to be underreported."

119.    Controller DiNapoli concluded, "The public was misled by the highest level of state government and given a distorted version of reality that suppressed facts when they deserved the truth. It is unacceptable that we still don't know just how many nursing home residents died."

120.    Governor Cuomo arrogantly and callously mocked all of this, stating, "Who cares if they died in the hospital, died in a nursing home? They died."

121.    Governor Cuomo's mockery is beyond the pale, as the New York Defendants' deliberate underreporting of the State's nursing home deaths was most definitely material, as New York officials missed a crucial opportunity to provide better data that would have saved lives.

122.    Accurate data on the toll of Covid in New York nursing homes would have enabled policymakers to target resources to facilities struggling to contain infections. In addition, family caregivers needed accurate information to know where to place their loved ones who are in need of nursing home care. The New York Defendants' deliberate concealment of how serious the pandemic was in long-term care facilities obstructed efforts to estimate how many people died due to Covid.

123.    Defendants had all of the expert information on what to do, and cannot say that they were not warned, and as a result, cannot credibly assert an objectively reasonable reliance on existing law. There is no doubt that through the Directives, the nursing homes and assisted living facilities were thrown under the bus.

124.    The record further reveals that the New York Defendants:

        a.      misstated how the March 25 Directive worked and where it came from;

        b.      omitted thousands of victims from official death counts;

        c.      rewrote and falsified a Health Department report;

        d.      knowingly disseminated skewed and misleading statistics;

        e.      stonewalled legislative inquiries; and

        f.      withheld public records in defiance of the Freedom of Information Law.

125.    As a direct and proximate result of Defendants' promulgation of the Directives:

        a.      15,000 elderly New York nursing home and assisted living facility residents, including Michael and Dolores Newman were exposed to Covid;

        b.      Covid was capable of causing the particular injuries suffered, specifically their death deaths from Covid; and

        c.      15,000 elderly New York nursing home and assisted living facility residents including Michael and Dolores Newman were exposed to sufficient levels of Covid to cause their deaths.

126.    As a direct and proximate result of Defendants' misconduct, deliberate indifference and malicious intent through the promulgation of the Directives, as many as 15,000 elderly New York nursing home residents including Michael and Dolores Newman lost their lives.

28

127.    As a direct and proximate result of Defendants' misconduct, deliberate indifference and malicious intent through the promulgation of the Directives, New York's nursing homes and assisted living facilities suffered the most Covid deaths in the entire country.

128.    As a direct and proximate result of efendants' misconduct, deliberate indifference and malicious intent through the promulgation of the Directives, Michael J. Newman, age 84, caught Covid after March 25, 2020, and died a horrible death on March 29, 2020, while his wife Dolores D. Newman, age 78, caught Covid after March 25, 2020, and died a horrible death on April 14, 2020.

129.    According to data released by the New York Department of Health subsequent to the departure of Defendant Zucker, "The admission of coronavirus-positive patients into New York nursing homes under March 25 guidance from the New York State Department of Health was associated with a statistically significant increase in resident deaths."

130.    Nothing can replace the loss of Michael Newman, Dolores Newman, and all those similarly situated in the Statewide Class, but their Estates now seek appropriate healing and resolution, as Michael's life, Dolores' life, as well as the lives of all of New York's nursing home and assisted living facility Covid casualties meant something, as none of them deserved to die such horrific and preventable deaths.

## CLASS ALLEGATIONS

131.    Plaintiff brings this Statewide class action on behalf of itself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

132.    The Statewide Class that Plaintiff seeks to represent is defined as follows:

> All individuals who were New York nursing home and/or assisted living facility residents where a Covid positive patient was admitted after the March 25, 2020/April 7, 2020 Directives and who subsequently contracted Covid, and then died of Covid (the "Statewide Class").

133.    Excluded from the Statewide Class are the following individuals and/or entities: the Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

135.    Plaintiff reserves the right to modify or amend the definition of the proposed Statewide Class before the Court determines whether certification is appropriate.

136.    **Numerosity, Fed R. Civ. P. 23(a)(1):** Classes are so numerous that joinder of all members is impracticable. The Statewide Class consists of all individuals who were New York nursing home/assisted living facility residents where a Covid positive patient was admitted after the March 25, 2020/April 7, 2020 Directives, and who subsequently contracted Covid, and then died of Covid, a number estimated to be 15,000 (fifteen-thousand) Class Action plaintiffs. Statewide Class

members are apparently identifiable within the New York Defendants' records, and/or other public records.

137.    **Commonality and predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3):** Questions of law and fact common to the Statewide Class exist and predominate over any questions affecting only individual Statewide Class Members. These include:

a.    Whether and to what extent Defendants engaged in conduct which shocks the conscience in order to state a §1983 claim;

b.    Whether and to what extent Defendants violated the State-Created-Danger Doctrine in order to state a §1983 claim;

d.    Whether as of March 25, 2020, Class Members were New York nursing home residents where a Covid positive patient was admitted.

e.    Whether Class Members who were New York nursing home residents where a Covid positive patient was admitted, caught Covid after March 25, 2020, and then died of Covid.

f.    Whether as of April 7, 2020, Class Members were New York assisted living facility residents where a Covid positive patient was admitted.

g.    Whether Class Members who were New York assisted living residents where a Covid positive patient was admitted, caught Covid after April 7, 2020, and then died of Covid.

h.    Whether Statewide Class Members are entitled to actual damages and punitive damages as a result of Defendants' wrongful conduct.

138.    **Typicality, Fed. R. Civ. P. 23(a)(3):** Plaintiff's claims are typical of those of other Class Members because all were New York nursing home/assisted living facility residents where a Covid positive patient was admitted after the March 25, 2020/April 7, 2020 Directives, and who subsequently contracted Covid, and then died of Covid.

31

139.    **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Statewide Class Members, and making final compensatory relief appropriate with respect to the Class as a whole. Defendants' conduct and policies challenged herein apply to and affect the Statewide Class Members uniformly and Plaintiff's challenge of this conduct and these policies hinges on the Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

140.    **Adequacy, Fed. R. Civ. P. 23(a)(4):** Plaintiff will fairly and adequately represent and protect the interests of the Statewide Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Statewide Class Members. Plaintiff has retained counsel experienced in complex constitutional law litigation, and Plaintiff intends to prosecute this action vigorously.

141.    **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3):** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Statewide Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of claims by certain Class Members, who could not

individually afford to litigate a complex claim against a large governmental entity, like the New York Defendants, and large corporate entities like GNYHA and Northwell. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

142.    The nature of this action and the nature of laws available to Plaintiff and Statewide Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Statewide Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

143.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Statewide Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

144.    Adequate notice can be given to Class Members directly using information maintained in the New York Defendants' records and/or other public records.

145.     Further, the Defendants have acted or refused to act on grounds generally applicable to the Statewide Class and, accordingly, final compensatory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

146.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.     Whether and to what extent Defendants engaged in conduct which shocks the conscience in order to state a §1983 claim;

b.     Whether and to what extent Defendants violated the State-Created-Danger Doctrine in order to state a §1983 claim;

d.     Whether as of March 25, 2020, Class Members were New York nursing home residents where a Covid positive patient was admitted.

e.     Whether Class Members who were New York nursing home residents where a Covid positive patient was admitted, caught Covid after March 25, 2020, and then died of Covid.

f.     Whether as of April 7, 2020, Class Members were New York assisted living facility residents where a Covid positive patient was admitted.

g.     Whether Class Members who were New York assisted living residents where a Covid positive patient was admitted, caught Covid after April 7, 2020, and then died of Covid.

h.     Whether Statewide Class Members are entitled to actual damages and punitive damages as a result of Defendants' wrongful conduct.

## APPLICATION OF NEW YORK LAW TO THE STATEWIDE CLASS

147.     The laws of New York should govern Plaintiff's claims and, therefore, the claims of the Statewide Class that Plaintiff seeks to represent.

34

148.    The New York Defendants are located at the New York State Capitol Building, Albany, NY 12224 and the Corning Tower, Empire State Plaza, Albany, NY 12237. The GNYHA Defendants are located at 555 West 57th Street, 15th Floor, New York, NY 10019.  The Northwell Defendants are 2000 Marcus Avenue, New Hyde Park, NY  11042-1169. Upon information and belief, these locations are the "nerve centers" of Defendants' governmental  and business activities—the place where their executive-level and similarly-responsible officers, directors, and other high-level employees direct, control, and coordinate the government's activities, including major policy and legal decisions.

149.    New York has a significant interest in regulating the conduct of government as well as businesses operating within its borders. New York, which seeks to protect the rights and interests of residents and citizens has the exclusive interest in this matter, as Plaintiff, the Statewide Class, and Defendants, all reside or do business in New York, and all activities chronicled in this Complaint, occurred in New York.

150.    Application of New York law to Plaintiff's and the Statewide members' claims would be neither arbitrary nor fundamentally unfair because New York has a significant interest in the claims of Plaintiff and members of the Statewide Class.

151.    Under choice of law principles applicable to this litigation, the common law of New York would apply to all common law claims, as well as the New York law claims, of all class members because New York's significant interest in regulating the conduct of government operating within its borders.

**FIRST COUNT**

**(Civil Rights Act of 1871 - <mark>42 U.S.C. § 1983</mark>)**

152.    Plaintiff repeats, realleges, and re-emphasizes the allegations set forth in Paragraphs 1 through 151  as if set forth herein full, and as the basis for this claim.

153.    Defendants, at all times and in all events relevant hereto, have acted under the color of authority of the statutes of the State of New York.

154.    The actions of Defendants, in violation of <mark>42 U.S.C. § 1983</mark>, were performed under the color of authority of state statutes and/or the customs or usage of the State of New York and have caused Michael Newman, Dolores Newman, as well as the Statewide Class to be deprived of their constitutionally guaranteed right to life and bodily integrity secured and guaranteed under the Fifth and Fourteenth Amendments of the United States Constitution, and corresponding rights guaranteed by the New York State Constitution.

155.    Defendants palpably abused their discretionary authority in that their actions were in all regards arbitrary, capricious, unreasonable, and otherwise wrongful in violation of the federal and state constitutional rights of Michael J. Newman, Dolores D. Newman, and the Statewide Class.

156.    The interests of Michael J. Newman, Dolores D. Newman, and the Statewide Class have been adversely affected and manifest injustice has resulted from Defendants' arbitrary, capricious, and unconstitutional actions.

157.    Specifically the actions of the Defendants as chronicled herein, were based upon improper motives and were:

      a.    arbitrary, capricious, unreasonable, and oppressive; and

      b.    based upon unlawful criteria.

158.    Private parties such as GNYHA and Northwell became "willful participants" when their agents, specifically Defendants Raske and Dowling engaged in activity with the New York Defendants which deprived others of constitutional rights. *Dennis v. Sparks*, 449 U.S. 27 (1980).

159.    The right to life is unquestionably established, as the Fifth and Fourteenth Amendments both prohibit the deprivation of the fundamental right to life without due process of law.

160.    The States are committed "to the protection and preservation of all human life." *Washington v. Glucksburg*, 521 U.S. 702, 710, 117 S.Ct. 2258, 2263, 138 L.Ed. 772 (1997).

161.    It is undisputed that the Due Process Clause protects an interest in life. *Cruzan by Cruzan v. Direct, Missouri Dept. of Health*, 497 U.S. 261, 281, 110 S.Ct. 2841, 2853, 111 L.Ed. 224 (1990).

162.    One's right to life is a fundamental right that cannot be submitted to a vote, and is not dependent upon the outcome of elections. *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185-86, 87 L.Ed. 674 (1943).

163.    The interests protected by substantive due process include, "among other things, an individual's right to bodily integrity free from unjustifiable governmental interference." *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007).

164.    Additionally, §16 of the New York State Constitution provides in pertinent part, "The right of action, now existing to recover damages for injuries resulting in death, shall never be abrogated; and the amount recoverable shall not be subject to any statutory limitation."

165.    Defendants' aforementioned course of conduct against Michael Newman, Dolores Newman, and the Statewide Class was also:

      a.    not reasonably related to a legitimate government interest;

      b.    in fact motivated by bias, bad faith and/or improper motive; and

      c.    in and of itself, egregiously unacceptable and outrageous.

166.    By egregiously depriving Michael J. Newman, Dolores D. Newman, and the Statewide Class of their right to life in a manner that shocks the conscience, Defendants have violated their Fourteenth Amendment right to substantive due process.

167.    Based upon the foregoing, Michael J. Newman, Dolores D. Newman, and the Statewide Class suffered a forseeable and fairly direct harm, namely their death from Covid as a result of the Directives expressly prohibiting nursing homes/assisted living facilities from denying admission or re-admission of patients/residents who have tested positive for Covid, while also prohibiting nursing homes from requiring a hospitalized patients/residents who were determined to be "medically stable", to be tested for Covid prior to admission/re-admission.

168.    Defendants acted with a degree of culpability that shocks the conscience. Despite all of the warnings, and all of the insurmountable real world logistical obstacles, Defendants dogmatically in tone-deaf fashion, exercised deliberate indifference and malicious intent by implementing the Directives anyway.

169.    Michael J. Newman, Dolores D. Newman, and the Statewide Class, as nursing home/assisted living facility patients, were foreseeable victims and/or members of a discrete class of persons harmed by Defendants' actions.

170.    Through the Directives, Defendants affirmatively used their authority to create a danger of Michael J. Newman, Dolores D. Newman, and the Statewide Class catching and dying from Covid and/or made Michael J. Newman, Dolores D. Newman, and the Statewide Class more vulnerable to that danger if they had not acted at all.

171.    Through their political, lobbying, legislative drafting and other public (and as yet non-publicly disclosed activities), the actions of the GNYHA Defendants and the Northwell Defendants were also in violation of state law and constituted a corrupt conspiracy taken "under color" of law for purposes of § 1983 actions.

172.    Defendants are therefore liable under the State Created Danger Doctrine.

173.    Defendants, by engaging in the course of conduct chronicled herein, while acting under the color of state law, have individually and collectively deprived Michael, Dolores, and the Statewide Class of federal statutory and constitutional rights in violation of 42 U.S.C. § 1983.

## REQUESTED RELIEF

WHEREFORE, Plaintiff and the Statewide Class demands judgment as follows, jointly and severally against Defendants:

    a.    compensatory damages;

    b.    consequential damages;

    c.    punitive damages;

    d.    costs of suit;

    e.    interest;

    f.    statutory attorneys fees; and

    g.    such other relief as the Court deems necessary and just.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury of all of the claims so triable alleged herein.

> JONNA SPILBOR LAW
> Attorneys for Plaintiff Sean S. Newman,
> as the Administrator of the Estates of Michael
> J. Newman (deceased) and Dolores D. Newman (deceased)
> individually and on behalf of others

Dated: March 28, 2023   S/___ JONNA M. SPILBOR, ESQ. _____
> Jonna M. Spilbor, Esq.

40